**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**In re:**

**RICHARD HAISFIELD and AUDREY L. HAISFIELD,**

**Debtors.**

_____

CASE NO. 3:11-bk-08765-PMG

CHAPTER 11

**DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125,**
**FOR RICHARD HAISFIELD AND AUDREY L. HAISFIELD**

COUNSEL FOR DEBTORS

JIMMY D. PARRISH. ESQ.
BAKER & HOSTETLER LLP
200 S. ORANGE AVE.
SUNTRUST CENTER, SUITE 2300
ORLANDO, FLORIDA, 32801-3432

JUNE 14, 2012

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

**CASE NO. 3:11-bk-08765-PMG**

**RICHARD HAISFIELD and AUDREY L.**
**HAISFIELD,**

**CHAPTER 11**

    **Debtors.**

_____

**DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125,**
**FOR RICHARD HAISFIELD AND AUDREY L. HAISFIELD**

**I.    INTRODUCTION AND SUMMARY**

This Disclosure Statement (the "Disclosure Statement") is filed pursuant to the requirements of Section 1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-referenced bankruptcy case (the "Bankruptcy Case") to make informed judgments about the Plan of Reorganization (the "Plan") submitted by Richard Haisfield and Audrey L. Haisfield (the "Haisfields" or "Debtors"). The overall purpose of the Plan is to restructure the Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtors believe the Plan is reasonably calculated to lead to the best possible outcome for all creditors in the shortest amount of time and preferable to all other alternatives.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN**

**CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.**

**NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS**.

Richard Haisfield and Audrey L. Haisfield are debtors under Chapter 11 of the Code in a bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtors are placed into "Classes." The Debtors' Plan of Reorganization (the "Plan")

designates five (5) separate classes of Claims and Interests. The Plan contains three (3) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one (1) Class of Interests. The classification of Claims and the treatment of each Class are discussed in detail below.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired" and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan (the "Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

---

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is _____, 2012. All votes must be received by the Clerk of the United States Bankruptcy Court for the Middle District of Florida, 135 W. Central Boulevard, Suite 950, Orlando, FL 32801 by 5:00 p.m. (EST) on that day.

---

Upon receipt, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, the

Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.     DESCRIPTION OF DEBTORS' BUSINESS

   A.     In General.

   The Haisfields are married individuals who reside at 800 SW 85th Avenue, Ocala, FL 34481, Ocala, Florida.   Richard Haisfield assists as a farm manager for Stonewall Farm Ocala, LLC (the "Florida Farm") and, in return, the Florida Farm provides for certain living expenses of the Haisfields, including housing, transportation and utilities.   Mr. Haisfield also owns a stallion prospect named "Causeways' Kin" and owns a seventy-five percent (75%) interest in another stallion prospect named "Greatness."   Both Causeways' Kin and Greatness currently stand at the Florida Farm.   Additionally, Mr. Haisfield receives social security benefits in the approximate amount of $2,300 each month.   Ms. Haisfield assists in some light duties at the Farm, but does not have an official job or title at the Florida Farm.    The Haisfields jointly participate in a fifty percent (50%) ownership agreement with Edward Seltzer related to a mare named "La Mona Lisa," and a mare named "Whitepark Bay."   The Haisfields also jointly participate in a fifty percent (50%) ownership agreement with Edward Seltzer related to a foal from "La Mona Lisa" and "Greatness" and a foal from "Whitepark Bay" and "Greatness" (collectively, the "Foals").   Finally, the Haisfields hold an ownership interest in various real estate and equine companies, but it is not believed that such interests hold any material value at this time.

   B.     Events Leading to Chapter 11 Filing.

   Prior to the Petition Date, the Debtors owned multiple real estate and equine companies, including an entity named Stonewall Farm Kentucky, LLC ("SFK").   SFK operated a

4

stallion farm located in Versailles, Kentucky ("Kentucky Farm") acquired by a separate company owned by Audrey Haisfield.

While the Kentucky Farm experienced a tremendous amount of growth and success, its operations required a significant amount of working capital. Additionally, after its acquisition in January of 2004, the Kentucky Farm needed significant improvements and additional infrastructure to support a fully operational stallion breeding facility. From 2004 to 2005, a stallion breeding facility was constructed, a broodmare facility was constructed and additional farmland was purchased. The total infrastructure costs of land, new construction and improvements totaled approximately $23,000,000 from 2004 through 2008. Other costs included the purchase and development of a stallion roster and broodmare's to mate with the stallions.

In the Fall of 2005 after the completion of the stallion facility, the Haisfields formed an entity named Stonewall Farm Stallions, LLC ("SFS"). Until the fall of 2005, SFK operated almost all aspects of the Kentucky Farm's business. SFS was created to separate the stallion operation from the other operations of the Kentucky Farm. From 2005 through 2008, the Kentucky Farm grew substantially, but had significant overhead expenses and depreciation expenses.

As the U.S. economy began to spiral downward in 2008, the Kentucky Farm planned to participate in the Annual Yearling Sale at Keeneland and auction approximately twenty (20) of the Kentucky Farm's yearlings in September of 2008 in order to raise additional capital for operation costs. The Kentucky Farm planned to auction approximately ten (10) broodmares and approximately ten (10) weanlings the following November. Unfortunately, Lehman Brothers filed for protection under Chapter 11 of the Bankruptcy Code on September 15, 2008 at the start of the Keeneland Yearling Sales. As a result, lending that was already

severely restricted became nonexistent and auction prices dropped.  Many of the Kentucky Farm's yearlings were not sold due to the extremely low bids.  The broodmare sale and the weanling sale that followed in November were equally dismal as lending became increasingly harder to obtain.

While the Kentucky Farm and the various entities affiliated with it had substantial assets, cash flow tightened.  Commencing in 2009, some of the Debtors' entities began having cash flow shortages.  Certain of the Debtors' entities (Nevertell Farm, IV, LLC, Stonewall 53, LLC and others fell behind on loans with Fifth Third Bank, but were active in negotiations to restructure the debt.  In addition, the Debtors and an affiliated entity Overall Thoroughbreds, LLC ("Overall") commenced discussions with Harleysville National Bank ("HNB"), about restructuring its secured debt.  In May, Fifth Third bank declared a default and on June 25, 2009 HNB declared a default, but continued workout discussions with the Debtors and Overall through 2010.  Prior to reaching an agreement with Overall and the Debtors, HNB sold the loan to Cincinnati Capital Corporation ("CCC").  Negotiations broke down after CCC acquired the loan and CCC proceeded with its action on the note from Overall and related guarantee and foreclosure proceedings.

Following the defaults of Fifth Third Bank and CCC, a domino effect occurred, and the Debtors subsequently defaulted on loans with Chase Bank.  In an effort to preserve the value of the farm and other equine companies, SFS and several affiliates (the "Stallion Entities") filed Chapter 11 bankruptcy cases in Kentucky and Florida ("Business Bankruptcy Cases").  The Business Bankruptcy Cases provided a forum for the farm and related entities to commence a meaningful dialogue with creditors and preserve the value of the Stallion Entities.

After successfully auctioning several assets, The Debtors and the Stallion Entities were able to reach agreements on the disposition of all remaining bank collateral owned by the Stallion Entities and dismiss the Business Bankruptcy Cases.  While these agreements settled the liability and the majority of the collection efforts against the Stallion Entities, they did not affect the rights of the parties with respect to the considerable guarantee claims of the Debtors.  CCC, Fifth Third and other lenders moved forward with guarantee claims against the Debtors and obtained money judgments.  By late 2010, CCC had domesticated its judgment against the Debtors and commenced a secondary lawsuit against the Debtors and certain members of the Debtors' family alleging improper transfers (the "CCC Lawsuit").  The facts and circumstances related to the allegations in the CCC Lawsuit are more fully explained in the next section of this Disclosure Statement.  The CCC lawsuit proceeded through discovery and a preliminary injunction hearing.  The Debtors vigorously defended the CCC Lawsuit and were successful in defending CCC's request for a preliminary injunction in the CCC Lawsuit before the Honorable Timothy Corrigan.  As the Debtors and the other defendants in the CCC Lawsuit were preparing for trial, CCC and two small purported creditors commenced involuntary bankruptcy cases against the Debtors.  The Debtors viewed the involuntary bankruptcy filings by CCC as a strategic maneuver to cancel the upcoming trial in the CCC Lawsuit after losing on their request for a preliminary injunction.  Moreover, the Debtors denied that CCC and certain of the other petitioning creditors had the appropriate standing to commence the involuntary petitions.  Despite vehemently denying the appropriateness of the involuntary petitions, the Debtors recognized that a Chapter 11 bankruptcy case would allow them to restructure their significant guarantee debt and other liabilities and provide some type of meaningful dividend to all of their

creditors.  Consequently, the Debtors elected to file their own voluntary petition under Chapter 11 of the Code on December 2, 2012.

        C.    <u>Fraudulent Transfer Allegations</u>.

        As mentioned above, prior to Petition Date, one of the Debtors' creditors (CCC) made allegations of improper transfers and commenced a lawsuit seeking to impose liability on the Debtors, certain family members and entities owned by the Debtors and family members of the Debtors.  Most of the allegations involve the acquisition, ownership, and disposition of a thoroughbred stallion known as Medaglia D'Oro (the "Stallion").  After a thorough review of the various transactions involving the Stallion, Debtors concluded no improper transfers occurred and provide this disclosure in support of the assertion.

        In June of 2004, the Stallion was purchased by Never Tell Farms Kentucky, II, LLC ("NTK II"). NTK II was originally 100% owned by Stonewall Farm Kentucky, LLC ("SFK") and, SFK, was, in turn, one hundred percent (100%) owned by Debtor, Ms. Audrey Haisfield ("Audrey").  During 2004 and 2005, All Star Equine Investments, LLC, ("ASE"), a company owned by Randy Haisfield ("Randy"), contributed $400,610 in return for a seven percent (7%) interest in NTK II.  As a result of these transactions, NTK II was owned ninety-three percent (93%) by SFK and seven percent (7%) by ASE.

        In August of 2007 Marc Haisfield ("Marc") and Randy each loaned Audrey $900,000 guaranteed by NTK II, Stonewall Farm Stallions I, LLC ("SWFS I"), Stonewall Farm Stallions VII, LLC ("SWFS VII") and Stonewall Farms Racing Division I, LLC ("SWFRD I") and such loans were secured by Audrey's interests in NTK II, SWFS I, SWFS VII and SWFRD I (hereinafter referred to as the "Audrey Loan").  Audrey used the $1,800,000 to pay down outstanding secured debt that was guaranteed and cross collateralized with NTK II and owed to Chase Bank, N.A. ("Chase").  Subsequently, from September 2007 through April 2008, Marc

and Randy Haisfield increased the Audrey Loan by $250,000 and $270,000 respectively, which increased the total amount loaned to $2,320,000.  The additional advances were used for loan payments and general operating capital for SFK and SFS.

Additionally, in August of 2007, Marc purchased a five percent (5%) equity interest in NTK II from SFK for $175,000.  The purchase price was based upon the equity value at the time of the purchase, was subject to the existing debt and the transaction was reported by all parties for tax purposes.  SFK used the funds for general operating expenses.  As a result of the transaction, NTK II was owned eighty-eight percent (88%) by SFK, seven percent (7%) by ASE and five percent (5%) by Marc.

As of August 2007, the Stallion was owned one hundred percent (100%) by NTK II and, NTK II, in turn was owned as follows: (a) eighty-eight percent (88%) by SFK; (b) seven percent (7%) by ASE; and (c) five percent (5%) by Marc.

In March 2008, Palm Beach Stallions I, LLLP ("PBS"), a limited partnership in which Marc was a managing member, but not an owner, purchased a divided eight percent (8%) ownership of the Stallion from NTK II for $1,209,600.  At the time of the transaction, the Stallion was valued at $15,000,000.  As a result of the transaction, NTK II owned ninety two percent (92%) of the Stallion and PBS owned eight percent (8%).  NTK II used proceeds from the sale to pay down its secured debt to Chase.

Even though the value of the Stallion was rising dramatically, SFK was tight on cash to pay operation expenses and loan payments.  To allow for the pay down of Chase debt and attract new investors, a new entity named Medaglia I, LLC ("Medaglia I") was formed in August 2008.  NTK II was the one hundred percent (100%) equitable owner of Medaglia I.  On August 6, 2008, through financing from Lydian Bank ("Lydian) (roughly $8,500,000) and MDO, LLC

("MDO"), a private, non-related lender (roughly $2,500,000), Medaglia I acquired as part of a financing transaction eighty-two percent (82%) of the ownership in the Stallion from NTK II ("Medaglia I Transaction").   While the eighty-two percent (82%) ownership was conveyed to Medaglia I in connection with the Medaglia I Transaction, NTK II retained ownership through Medaglia I and a nominee agreement executed by the parties.   NTK II used the proceeds from the Medaglia I Transaction to pay down $8,000,000 of debt owed to Chase Bank and cover operational costs of SFK and the Kentucky Farm.   As a result of the Medaglia I Transaction, Medaglia I owned eighty-two percent (82%) of the Stallion, NTK II owned ten percent (10%) of the Stallion and PBS owned 8% of the Stallion.   Moreover, as a result of the transaction: (i) Medaglia I was owned one hundred percent (100%) by NTK II; and (ii) NTK II was owned 88% by SFK, 7% by ASE and 5% by Marc.

Simultaneously with the Medaglia I Transaction, Colts Neck LLC ("Colts Neck), a non-related third party company, purchased NTK II's remaining ten percent (10%) in the Stallion for the amount of $1,800,000 (First Colts Neck Purchase").   NTK II used the proceeds of the First Colts Neck Purchase to pay down some of the debt and support operations of SFK. As a result of the Medaglia I Transaction and the First Colts Neck Purchase, Medaglia I owned eighty-two percent (82%) of the Stallion, Colts Neck owned ten percent (10%) of the Stallion and PBS owned eight percent (8%) of the Stallion.   NTK II no longer had any direct ownership of the Stallion; it simply owned one hundred percent (100%) of Medaglia I.

In October 2008, Colts Neck purchased an additional ten percent (10%) ownership in the Stallion from Medaglia I ("Second Colts Neck Purchase").   The purchase price was $2,000,000 as the Stallion had increased to approximately $20,000,000.   The proceeds were reported for tax purposes and the funds used to support operations of SFK.   In connection with

the First Colts Neck Purchase and the Second Colts Neck Purchase, SFK, Marc and ASE agreed

that SFK would receive all of the proceeds of the two transactions in return for an adjustment of

Marc's five percent (5%) interest to 6.94% in NTK II and ASE's seven percent (7%) interest to a

9.72% interest in NTK II.  In other words, SFK exchanged a portion of its ownership in NTK II

to Marc and ASE as a result of the two Colts Neck transactions.  This exchange was reported for

tax purposes and resulted in Marc and ASE having the same ultimate equity ownership in the

Stallion that existed prior to the two Colts Neck transactions.  As a result of the two Colts Neck

transactions, Medaglia I owned seventy-two percent (72%) of the Stallion, Colts Neck owned

twenty percent (20%) of the Stallion and PBS owned eight percent (8%) of the Stallion.

Medaglia I was owned one hundred percent (100%) by NTK II and NTK II was owned 83.34%

by SFK, 9.72% by ASE and 6.94% by Marc.

On June 9, 2009, the Stallion was sold to Darley Stud Management, LLC, an

unrelated third party ("Stallion Sale").  The amount paid for Medaglia I's seventy two percent

(72%) ownership was $32,400,000 (the "Medaglia I Proceeds").  The Medaglia I Proceeds were

first used to repay the non-related secured lenders (Lydian and MDO) in the approximate amount

of $15,466,222.03.  Additionally, there were broker fees and services related to the stallion and

sale in the approximate amount of $920,000 paid to Bigalot, Inc. and Blue Water Holdings, LLC,

an unrelated party, and an additional $1,000,000 commission paid to Atoka Bloodstock, LLC.

An additional $138,333.33 were paid for 2008 and 2009 Breeder's Cup fees.  Accordingly, the

net amount due to Medaglia I was approximately $14,875,444.64.  Medaglia I disbursed this

amount to pay certain administrative costs and make distributions to owners.  Specifically, NTK

II received a distribution of $13,171,669.64, Randy received $1,150,675.00 in accordance with

that Agreement dated May 31, 2009 by and between Audrey Haisfield, Nevertell II, LLC,

Stonewall Farm Stallions I, LLC, Stonewall Farm Stallions VII, LLC, Stonewall Farm Racing Division I, LLC (collectively, the "Audrey Parties") and Randy Haisfield and All Star Equine Investments (collectively, the "Randy Parties"), ASE was paid $400,000 in accordance with the Unit Power Agreements selling their partnership units in six (6) stallion entities to SFS, an entity owned by Audrey, SFS received $150,000 for operating expenses and Moyle Flanigan received $3,200 for administrative costs related to the closing.

NTK II distributed the $13,171,669.64 as follows: (i) $3,000,000 was paid to Marc to repay his portion of the Audrey Loans and cover his 6.947% due as distribution; (ii) $2,500,000 was paid to Chase Bank for payment on loans to NTK II and SFK; (iii) $330,000 was paid to First Choice Breeding to retire their five (5) annual breeding rights in accordance with the agreement dated March 26, 2009; (iv) $270,000 was paid to Marc for breeding rights owed; (v) $720,000 was paid to PBR for the breeding rights revenue owed on six (6) annual nominations for 2009 and 2010 by Medaglia I to PBR in accordance with the Assignment of Breeding Rights Revenue dated December 31, 2008; and (vi) the balance of $6,351,569.94 was transferred to Haisfield Ventures, LP ("HV") as a distribution to the majority shareholder of SFK.  HV was owned and controlled by Debtors.  All of the funds that deposited into HV went to support the various business interests of Debtors and, $1,150,000 of the funds were used to partially repay documented loans from Lisa Haisfield Wilkenson, Marc Haisfield, Tracy Eggleston and Michael Haisfield.  A large portion of the funds was used to primarily support the expenses of SFK which, during the better part of 2009 through 2010 were approximately $1,000,000 per month. Debtors will make the entire accounting records for HV available upon request.

Overall, while the transactions involving the Stallion produced significant sums and involved a host of entities and transactions, none of the funds were distributed for less than

reasonably equivalent value or with the intent to hinder, delay, or defraud creditors.  All funds were either disbursed for legitimate and bona fide debts or services, or to other owners who paid value to Debtors for such ownership.

       D.      <u>Events Subsequent to Chapter 11 Filing</u>.

Since the Petition Date, the Debtors have been continuing to manage their affairs as debtors-in-possession under Sections 1101(a) and 1108 of the Code.  On April 17, 2012, the Court entered an order authorizing the Debtor to employ Jimmy D. Parrish and the Law Firm of Baker & Hostetler, LLP as counsel for the Debtors.  On March 30, 2012, the Debtors filed their first motion to extend the exclusive period to file a plan for thirty (30) days until May 2, 2012 and if a plan is filed by that time, an additional thirty (30) days until July 2, 2012 to obtain confirmation of that plan ("Exclusivity Motion").  Just prior to filing the Exclusivity Motion, the Debtors learned that the United States Trustee anticipated the formation of an Official Committee of Unsecured Creditors ("Committee") in the Case.  The Debtors then filed the Exclusivity Motion in order to give them an opportunity to discuss the plan with the Committee before filing.

On April 13, 2012, the United States Trustee filed its notice of appointment of the Committee.  The Committee originally suggested that it wanted to have substantive dialogue prior to the Debtors filing the Plan.  In order to give the parties additional time to have such dialogue, the Debtors filed an uncontested second motion to extend the exclusive period to file a plan until June 18, 2012 and if a plan is filed by that time until September 17, 2012 to obtain confirmation of that plan ("Second Exclusivity Motion").  Since filing the Second Exclusivity Motion, the Debtors have had some very preliminary discussions with the Committee regarding the plan, but no substantive dialogue has occurred.  Recently, the Committee has indicated to the

Debtors that preference is now for the Debtors to go ahead and file the Plan and that substantive discussions could be had after such filing if the parties so choose.

The Debtors and their counsel have had multiple discussions and negotiations with both secured and unsecured creditors of the Debtors related to: (i) the allowance of claims; (ii) adequate protection alternatives for holders of allowed secured claims; and (iii) other matters related to the administration of the Debtors estate.

III.    **THE PLAN**

**THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTORS' PLAN.  ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN.  THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

A.    Overview.

In summary, the Plan provides for a significant cash infusion by the Debtors to allow for a meaningful dividend to unsecured creditors and payment of secured claims over time with interest.  All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains five (5) Classes of Claims and Interests. There are three (3) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one Class of Interests.

Overall, the Plan provides that holders of Allowed Administrative Claims will be paid in full on the Effective Date. The Debtors will pay holders of Allowed Priority Claims over time, with interest, over a period of five years from the Petition Date with interest at five percent (5%).

The Holder of the Allowed Class 1 Claim, will retain its lien and will receive payments equal to one hundred percent (100%) of its Allowed Secured Claim, over time, according to the terms set forth herein. The Holder of the Allowed Class 2 Claim, will retain its

lien and will receive payments equal to one hundred percent (100%) of its Allowed Secured Claim, over time, according to the terms set forth herein. The Holder of the Allowed Class 3 Claim lien and will receive payments equal to one hundred percent (100%) of its Allowed Secured Claim, over time, according to the terms set forth herein. Each Holder of an Allowed Class 4 Claim, to the extent such Holder has an Allowed Claim and in full satisfaction of such Allowed Claim, will receive a pro rata share of the Guaranteed Payment on the Effective Date and a pro rata share of the Annual Dividend commencing on December 31, 2013 and continuing each year thereafter for three years. The Class 5 Interest Holders will retain their interest. Accordingly, all Classes, except Class 5 are Impaired under the Plan.

     B.    <u>Classification and Treatment of Claims</u>.

          1.    <u>Priority Claims</u>.

               a.    <u>Administrative Expense Claims</u>.

Holders of all Allowed Administrative Expense Claims of the Debtors shall be paid in full on the Effective Date or in accordance with existing credit or repayment terms. Debtors' cash-on-hand, as of the Effective Date, shall be used to pay Allowed Administrative Expense Claims.

               b.    <u>Priority Tax Claims</u>.

Except to the extent that the Holder and the Reorganized Debtors have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtors, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims will be paid over a period of five years from the Petition Date with interest at five percent (5%); the payments will be made quarterly. Payments will commence on the later of the first day of the first full quarter following the Effective Date or on the first day of the first full quarter following the date that the respective

Priority Claim becomes an Allowed Claim. To the extent a Holder of an Allowed Priority Tax Claim holds lien rights, such Holder will retain those rights, but may not enforce such rights if the Debtors are making payments to such Holder in accordance with the Plan. The Debtors do not anticipate their being any Allowed Priority Tax Claims.

        2.    <u>Secured Claims</u>.

        a.    <u>Class 1 — BMW Financial Services</u>.

Class 1 consists of the Allowed Secured Claim of BMW which arises from a pre-petition purchase money loan for the purchase of a 2009 BMW X3 Wagon (the "Wagon"). The Class 1 Claim is estimated in the amount of $23,964.59 and is secured by a purchase money, first priority lien on the Wagon. In full satisfaction of BMW's Allowed Secured Claim, BMW shall retain its lien on the Wagon and on the first day of the month following the Effective Date, the Debtors shall commence monthly payments to BMW on account of the Allowed Class 1 Claim based upon a three (3) year amortization and maturity with interest at a fixed rate of five percent (5%). The Debtors may prepay the entire Allowed Class 1 Secured Claim at any time without penalty.

        b.    <u>Class 2 — Team Valor International</u>.

Class 2 consists of the Allowed Secured Claim of Team Valor International which arises from a prepetition purchase money loan in the original principal amount of $62,500 and is secured by a first priority lien in the stallion prospect Causeway's Kin. The Class 2 Secured Claim is estimated in the amount of $62,500. Team Valor International will retain its lien on Causeway's Kin and an on the first day of the month following the Effective Date Team Valor International will commence accruing interest at a rate of five percent (5%) on the Allowed Class 2 Claim. On the one year anniversary of the Effective Date, the Debtors will commence monthly payments on the total outstanding balance owed (Allowed Secured Claim

plus accrued interest) based upon a three year amortization and maturity with interest at five percent (5%).

        c.        <u>Class 3 —The Greatness Syndicate</u>.

Class 3 consists of the Allowed Secured Claim of The Greatness Syndicate which arises from a prepetition purchase money loan in the original principal amount of $62,500 and is secured by a first priority lien in the stallion prospect Greatness.  The Class 3 Secured Claim is estimated in the amount of $62,500.  The Greatness Syndicate will retain its lien on Greatness and an on the first day of the month following the Effective Date The Greatness Syndicate will commence accruing interest at a rate of five percent (5%) on the Allowed Class 3 Claim.  On the one year anniversary of the Effective Date, the Debtors will commence monthly payments on the total outstanding balance owed (Allowed Secured Claim plus accrued interest) based upon a three year amortization and maturity with interest at five percent (5%).

        3.        <u>Class 4 - General Unsecured Claims</u>.

Class 4 consists of the Allowed Claims of Unsecured Creditors. Each Holder of an Allowed Class 4 Unsecured Claim shall be entitled to a pro rata share of the Guaranteed Payment on the Effective Date and a pro rata share of the Annual Dividend commencing on December 31, 2013 and continuing each year thereafter for three years.

        4.        <u>Class 5 - Equity Interests</u>.

Class 5 is unimpaired. Class 5 consists of the ownership interest of the Haisfields.  The Haisfields will retain their ownership interest in property of the estate.

C.      Means of Implementation.

    1.      Contributed Funds/Guaranteed Payment.

        Prior to the Effective Date, Marc Haisfield, Randy Haisfield, Michael Haisfield, Tracy Eggleston and Lisa Haisfield Wilkenson, along with their respective business entities and affiliates (collectively, the "Released Parties") shall collectively contribute the total amount of $200,000 to the Debtors' estate (the "Contributed Funds") in exchange for a release of any and all claims of the estate and parties-in-interest.  The Haisfields will use $150,000 of the Contributed Funds to pay the Guaranteed Payment of $150,000 which will be paid on a pro rata basis to Holders of Allowed Class 4 Claims. It is anticipated that the remaining $50,000 will be used to pay any outstanding administrative and priority claims.

    2.      Annual Dividend.

        Commencing on December 31, 2013, the Debtors will make a pro rata distribution to Holders of Allowed Class 4 Claims from one half of the net profits received by the Debtors during that calendar year from stud fees from Greatness and Causeway's Kin as well as any funds received from Whitepark Bay, La Mona Lisa and the Foals.

    3.      Funds Generated During Chapter 11.

        Funds generated from stud fees of Greatness and Causeway's Kin along with any other amounts earned by the Debtors through the Effective Date will be used for household expenses and Plan Payments.  The Debtors believe that cash flow from stud fees related to Causeway's Kin and Greatness along with the Contributed Funds will be sufficient to meet all required Plan Payments.

D.      Unexpired Leases and Executory Contracts.

        To the extent the Debtors reject any executory contract or unexpired lease prior to the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Code, arising

18

from the rejection of an executory contract or lease shall file a proof of such Claim within

thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed

Claim resulting from rejection shall be a Class 4 Claim except as otherwise provided herein.

The Debtors shall have through and including the hearing on Confirmation within which to

assume or reject any unexpired lease or executory contract; and, further, that in the event any

such unexpired lease or executory contract is not assumed (or subject to a pending motion to

assume) by such date, then such unexpired lease or executory contract shall be deemed rejected

as of the Confirmation Date.

IV.    **CONFIRMATION**

    A.    Confirmation Hearing.

        Section 1128 of the Code requires the Court, after notice, hold a Confirmation

Hearing on the Plan at which time any party in interest may be heard in support of or in

opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time

without further notice except for an announcement to be made at the Confirmation Hearing. Any

objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the

following persons, at least seven (7) days prior to Confirmation Hearing:

        Counsel for Debtor:

        Jimmy D. Parrish, Esquire
        Baker & Hostetler LLP
        200 S. Orange Ave.
        SunTrust Center, Suite 2300
        Orlando, Florida 32801-3432

        Debtors:

        Richard Haisfield
        Audrey L. Haisfield
        800 SW 85th Avenue
        Ocala, Florida 34481

<u>United States Trustee</u>:

Office of the United States Trustee
Attn: Tim Lafreddi, Esquire
135 W. Central Blvd., Suite 620
Orlando, Florida 32801

B.      <u>Financial Information Relevant to Confirmation</u>.

Attached as Exhibits, and incorporated herein, are the following:

(i)      **<u>Exhibit "A"</u>** is a copy of the Debtors' Chapter 7 liquidation analysis (the "Liquidation Analysis") establishing that the Creditors of the Debtors will fair materially poorer in the event the Debtors are forced into Chapter 7 as compared to the Plan.

C.      <u>Confirmation Standards</u>.

For a plan of reorganization to be confirmed the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. The Debtors believe that the Plan satisfies all of the requirements for Confirmation.

1.      <u>Best Interests Test</u>.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an

Allowed Claim or Interest of such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code. The Debtors believe that the Liquidation Analysis establishes satisfaction of this test.

To determine what holders of Claims and Equity Interests would receive if the Debtors were liquidated, the Bankruptcy Court must determine how the assets and property of the Debtors would be liquidated and distributed in the context of a Chapter 7 liquidation case.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee and any unpaid expenses incurred by the Debtors during the Chapter 11 Case, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors would receive meaningful distributions. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from the pending Chapter 11 Case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors.  Liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any Payment.

The Debtors have carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Equity Interests, including the following:

a.      the possible costs and expenses of the Chapter 7 trustee or trustees;

b.      the possible adverse effect on recoveries by Creditors under Chapter 7 due to reduced sale prices for the Debtors' assets caused by the forced Chapter 7 liquidation; and

c.      the possible substantial increase in Claims, which would rank prior to or on parity with those of Unsecured Creditors.

2.      <u>Financial Feasibility</u>.

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless the liquidation is proposed in the Plan.  The Debtors believe that their income from stallion prospects, broodmares and foals will generate sufficient cash flow to make all Plan Payments as noted herein. The Debtors anticipate preparing financial projections to support its assertion that the Plan is feasible and Confirmation is not likely to be followed by further financial reorganization.  The Debtors will include a copy of any financial projections as part of the Debtors' affidavit in support of confirmation.

3.      <u>Acceptance by Impaired Classes</u>.

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan.  Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan provides that on the Effective Date the holder of the Claim or Interest receives on account of such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any Interest, any fixed liquidation preference to which the holder is entitled.

> 4.    Confirmation Without Acceptance by all Impaired Classes; "Cramdown".

The Code contains provisions that enable the Court to confirm the Plan, even though all Impaired Classes have not accepted the Plan, provided that the Plan has been accepted by at least one Impaired Class of Claims Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under and has not accepted the Plan.

**THE DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF THE PLAN AND WILL SEEK SUCH RELIEF.**

D.      Consummation.

The Plan will be consummated and payments made if the Plan is Confirmed pursuant to a Final Order of the Court and Plan Distributions commence. It will not be necessary for the Debtors to await any required regulatory approvals from agencies or departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.      Effects of Confirmation.

1.      Authority to Effectuate the Plan.

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Debtors shall be authorized, without further application for an order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan in accordance with this Plan and the Code.

2.      Binding Effect of Confirmation.

Confirmation of the Plan will legally bind the Debtors, all Creditors, Interest Holders, and other Parties in Interest to the provisions of the Plan whether or not the Claim or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder voted to accept the Plan.

3.      Discharge of Claims.

To the fullest extent permitted by applicable law, and except as otherwise provided in the Plan, the operative documents implementing the Plan, or the Confirmation Order: (a) upon the completion of all payments required under the Plan or grant of early discharge by the Court, the Confirmation Order shall operate as a discharge under 11 U.S.C. §1141(d)(1) of the Bankruptcy Code, and as a release of any and all Claims, Debts, Liens, Security Interests,

and encumbrances of and against the Debtors and all Property that arose before Confirmation, including without limitation, any Claim of a kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all principal and interest, whether accrued before, on, or after the Petition Date, regardless of whether (i) a Proof of Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to §502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the completion of all payments required under the Plan (i) all Holders of Claims shall be barred and enjoined from asserting against the Debtors and its property any Claims, Debts, Liens, Security Interests, and encumbrances of and against all Property of the Estate, and (iii) the Debtors shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or an Interest. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any manner the discharge granted upon Confirmation of the Plan pursuant to § 1141 of the Bankruptcy Code.

        4.     <u>Continued Stay After Confirmation and Grant of Discharge</u>.

        As of the Confirmation Date, except as provided in the Plan, all Persons shall be stayed and precluded from asserting against the Debtors any other or further Claims, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date. Upon completion of the payments required under the Plan or grant of early discharge, the Confirmation Order shall be a judicial determination of discharge of all Claims against Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against Debtors at any time to the extent the judgment relates to discharged Claims.

5.       <u>Injunction</u>.

As part of the Confirmation Order, the Bankruptcy Court shall stay and prohibit all Holders of Claims, Liens, Security Interests, Liens, encumbrances rights and Interest in, to or against the Debtors or any of their assets from asserting, prosecuting or collecting such Claims, Liens, Security Interests (other than Liens or Security Interests expressly continued pursuant to the terms of the Plan or the operative documents between the Debtors and the Holder of a Claim regarding the treatment of the Claim under the Plan), encumbrances, rights and Interests against the Debtors; provided, however, that such stay shall not apply to any Claim asserted against the Debtors by a claimant based upon a default by the Debtors in performance of its obligations to the claimant under the Plan.  Upon completion of payments required under the Plan or grant of early discharge, the Bankruptcy Court shall permanently enjoin and prohibit all Holders of Claims, Liens, Security Interests, Liens, encumbrances rights and Interest in, to or against the Debtors or any of their assets from asserting, prosecuting or collecting such Claims, Liens, Security Interests (other than Liens or Security Interests expressly continued pursuant to the terms of the Plan or the operative documents between the Debtors and the Holder of a Claim regarding the treatment of the Claim under the Plan), encumbrances, rights and Interests against the Debtors; provided, however, that such stay shall not apply to any Claim asserted against the Debtors by a claimant based upon a default by the Debtors in performance of its obligations to the claimant under the Plan.

6.       **<u>Releases/Injunctions</u>.**

The Plan is premised upon the releases contained below.  The Debtors assert the releases are being given in consideration for the Contributed Funds and the Distributions to be made to Holders of Allowed Claims under the Plan.  The Contributed Funds

are essential to confirmation of the Plan and allow Holders of Allowed Unsecured Claims a substantial dividend with no collection costs or risks.

While the Debtors are proposing the releases for the Released Parties, the Debtors do not believe there are any meritorious Claims or Causes of Action against Released Parties.

a.      **Rule 3016(c) Declaration.**  In accordance with the requirements of Rule 3016(c), the provisions herein operate to specifically release the Released Parties from all claims related to the Debtors that arose prior to the Effective Date ("Released Claims") and enjoin certain acts in connection with such releases.  Such releases and injunctions cover the Released Parties whose contributions are so critical to the reorganization effort that without them the reorganization would fail.  From and after the Confirmation Date, the releases described herein shall become effective and the Debtors, Parties in Interest, Unsecured Creditors, and Interest Holders shall be enjoined from commencing or continuing any Released Claims against the Released Parties.  Within this Section **bold print and italics** are used to identify the exact nature of releases and to identify the parties subject to the releases.

b.      ***General Releases by the Debtors and All Parties in Interest.***

*On the Effective Date, in consideration for the Contributed Funds and the Distributions to be made to Holders of Allowed Claims under the Plan,* ***the Debtors, All Parties in Interest, Unsecured Creditors and Interest Holders*** *will be deemed to forever release, waive, discontinue, and discharge all existing claims, obligations, proceedings, suits, judgments, damages, demands, debts, rights, causes of action under any theory, objection to Claims and liabilities, known or unknown, of any kind or nature, that are based in whole or in part on any act, failure to act, omission, transaction, or other occurrence taking place or arising on or  prior*

to the Effective Date, solely to the extent the foregoing relates in any way to the Debtors or any entity owned or controlled by the Debtors, that **the Debtors, All Parties in Interest, Unsecured Creditors and Interest Holders** has, had, or may have against the Released Parties. Notwithstanding the foregoing, the releases provided herein shall not affect in any manner the obligations arising under the provisions of the Plan, including the right to enforce the obligations of any party arising under the Plan and the contracts, instruments, releases, agreements, and documents delivered under or in connection with the Plan.

    c. <u>***Injunction Related to Releases.***</u> Except as expressly provided in the Plan or to otherwise enforce the terms of the Plan as of the Confirmation Date, **the Debtors and All Parties in Interest, including Unsecured Creditors and Interest Holders**, to the fullest extent permitted by applicable law, are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts, liabilities, Interests, or other rights: (i) commencing or continuing in any manner any action or proceeding against the Released Parties or their respective property, other than to enforce any right, pursuant to the Plan, to a distribution; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Released Parties; (iii) creating, perfecting, or enforcing any lien or encumbrance against the Released Parties; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Released Parties; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

    6. <u>Post-Confirmation Status Report</u>.

    Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Debtors will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on

the United States Trustee and those parties who have requested special notice post- confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.    ALTERNATIVE TO THE PLAN.

If the Plan is not confirmed and consummated, the Debtors believe that the most likely alternative is a liquidation of the Debtors under Chapter 7 of the Code. The Debtors believe that any liquidation is a much less attractive alternative to Creditors. In a Chapter 7 liquidation, the Creditors holding Allowed Class 4 Claims would be greatly diluted by litigation expenses and a recovery, if any, will likely be delayed for several years.  Debtors believe that liquidation of all personal property in a Chapter 7 scenario would dramatically reduce the total amount available to Creditors. In a case under Chapter 7 of the Code, a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to Creditors in accordance with the priorities established by the Code.  The Debtors' analysis of the probable recovery to Creditors and holders of equity Interest is set forth in the Liquidation Analysis.

## VI.    CONCLUSION.

The Debtors recommend that holders of Claims vote to accept the Plan.

DATED this 14th day of June, 2012, in Orlando, Florida.

/s/ Jimmy D. Parrish
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
jparrish@bakerlaw.com
BAKER & HOSTETLER, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
*Attorneys for Richard Haisfield*
*and Audrey L. Haisfield*

601269892.3

29

**EXHIBIT "A"**
**DISCLOSURE STATEMENT**

**RICHARD HAISFIELD AND AUDREY L. HAISFIELD**
**Case No.: 3:11-bk-08765-PMG**

|  | Estimated Liquidation Value as of <u>May 2, 2012</u> |
|---|---|
| <u>Asset</u> | |
| Cash | $107.00 |
| Personal Property | $215,329.50 |
| Real Property | $0 |
| TOTAL LIQUIDATION VALUE | $215,329.50 |
| Secured Debt | $151,000.00 |
| Administrative: Chapter 7 | $50,000.00 |
| Administrative: Chapter 11 | $150,000.00 |
| Priority and Secured Tax Claims | $0 |
| DEBT WITH PRIORITY OVER UNSECURED CREDITORS | $351,000.00 |
| AVAILABLE FOR GENERAL UNSECURED CREDITORS | -0- |